J-A01004-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| J.J.D. URETHANE COMPANY | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| WESTFIELD INSURANCE COMPANY, | : | |
| MUNICIPAL AUTHORITY OF THE | : | |
| BOROUGH OF BEDFORD, FIDELITY | : | No. 1440 EDA 2017 |
| AND DEPOSIT COMPANY OF | : | |
| MARYLAND AND HOWARD ROBSON, | : | |
| INC. | : | |
| | : | |
| | : | |
| APPEAL OF: WESTFIELD | : | |
| INSURANCE COMPANY | : | |

Appeal from the Order Entered April 7, 2017
In the Court of Common Pleas of Montgomery County Civil Division at
No(s):  No. 2016-02813

| | | |
|---|---|---|
| JJD URETHANE COMPANY | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| WESTFIELD INSURANCE COMPANY, | : | |
| MUNICIPAL AUTHORITY OF THE | : | |
| BOROUGH OF BEDFORD, FIDELITY | : | No. 1554 EDA 2017 |
| AND DEPOSIT COMPANY OF | : | |
| MARYLAND AND, HOWARD | : | |
| ROBSON, INC. | : | |
| | : | |
| | : | |
| APPEAL OF: WESTFIELD | : | |
| INSURANCE COMPANY | : | |

Appeal from the Order Entered April 6, 2017
In the Court of Common Pleas of Montgomery County Civil Division at
No(s):  No. 2016-02813

BEFORE:   LAZARUS, J., OTT, J., and PLATT*, J.

---

*   Retired Senior Judge assigned to the Superior Court.

J-A01004-18

MEMORANDUM BY LAZARUS, J.:                    **FILED FEBRUARY 09, 2018**

Westfield Insurance Company (Westfield) appeals from the trial court's orders,[1] entered in the Court of Common Pleas of Montgomery County, denying, without prejudice, its motion for summary judgment and granting in part and denying in part Appellee, JJD Urethane Company's (JJD) motion for summary judgment obligating Westfield to defend[2] and, if necessary, indemnify JJD in an underlying action.[3]   After careful review, we affirm.

JJD supplies and installs commercial urethane foam insulation. Westfield issued JJD a commercial general liability (CGL) policy, effective March 31, 2012 through March 31, 2013.  In May 2010, Howard Robson, Inc. (Robson), a construction company, hired JJD as a subcontractor to perform upgrade work on sewage digester tanks at a wastewater facility (facility)

---

[1] The orders from which Westfield are appealable as of right.  **See** 42 Pa.C.S. § 7532 (Declaratory Judgment Act); Pa.R.A.P. 311(b)(8) (interlocutory appeal as of right); **see also Nat'l Cas. Co. v. Kinney**, 90 A.3d 747 (Pa. Super. 2014) (denial of motion for summary judgment effectively disposed of all claims set forth in declaratory judgment complaint).

[2] We focus on the duty to defend, as it is broader than the duty to indemnify. **Kvaerner Metals Div. of Snaerner U.S., Inc. v. Commercial Union Ins. Co.**, 908 A.2d at 888 (Pa. 2006).  However, both duties "flow from a determination that the complaint triggers coverage." **General Accident Ins. Co. of America v. Allen**, 692 A.2d 1089, 1095 (Pa. 1997).

[3] **Municipal Auth. of the Borough of Bedford v. Fidelity and Deposit Co. of Maryland**, No. 2014-542 (Bedford County filed 10/7/14).

- 2 -

owned by the Municipal Authority of the Borough of Bedford (the Authority).[4]

Specifically, JJD was hired to supply and install urethane foam insulation to the annular space[5] on the tanks to create a seal against the tank walls.[6] Robson had been hired by the Authority in 2009 to upgrade the facility, which included constructing and performing certain work on its digester tanks.[7]

---

[4] Robson, as principal, and Fidelity and Deposit Company of Maryland, as surety, executed a performance bond, with the Authority as the obligee, in the amount of $13,573,000.00 in connection with the Authority's project.

[5] "Annular space" is the area between the top of the digester tanks and the body of the digester tanks. N.T. Summary Judgment Motion Hearing, 1/30/17, at 30.

[6] The subcontract agreement between Robson and JJD specifically stated:

> **SCOPE OF THE WORK**: The Work shall include all materials, equipment, parts and supplies described in the Subcontract Documents and all other incidental materials, equipment, parts and supplies that are necessary to completely enable the work and it to function as intended, regardless of whether they are shown, listed or otherwise disclosed in the Subcontract Documents. The Scope of Work shall consist of and include the following: **FIELD MEASURE, COORDINATE, FABRICATE, SUPERVISE, MOBILIZE, DELIVER, PREP, UNLOAD, RIG, HOIST, STAGE, INSTALL, CERTIFY AND WARRANT ALL DIGESTER COVER URETHANE INSULATION (2 DIGESTER COVERS MEASURING APPROXIMATELY 50" IN DIAMETER.)** in strict accordance with all the project plans, specifications and addenda.

Subcontract Agreement No. 09038.895, 5/3/10, at S.C. 1 (emphasis in original).

[7] Digesters are used to stabilize the solids that are removed from the wastewater during treatment. This stabilization can be performed by using aerobic digestion, which involves injecting oxygen into the sludge in an open tank, or anaerobic digestion, which takes place in an airtight container like in

When the Authority realized in 2012 that one of the digester tanks had been damaged and that Robson had failed to rectify the problem,[8] the Authority

_____

the instant case. https://www2.humboldt.edu/arcatamarsh/digester.html (last visited 1/24/18).

[8] In an October 29, 2012 letter, the engineering firm for the Authority notified Robson that there were several outstanding items requiring its attention under the terms of the parties' warranty agreement for the treatment facility. The letter indicated it was putting Robson on notice that the Authority intends to take action against the bond if the items are not fully addressed by November 15, 2012. The relevant item was described in the letter as follows:

> As a separate but related issue, this letter is to serve as a notice that a digester mixer on digester #3 has been damaged and may result in a significant warranty claim. After being removed from service and inspected by the equipment manufacturer, the manufacturer has concluded that the mixer impeller has been damaged due to some form of debris within the digester fluid. Based upon the observed damage, it is the position of the Authority that the size of debris impacted by the mixer could not have entered the digester tank through the sludge transfer pumps. **If, upon inspection, the debris that caused the damage was a result of either workmanship or material defects emanating with your work, all costs associated with the inspection, repair and/or replacement of the damaged components and handling of sludge will be borne by Howard Robson, Inc.** The Authority is currently making accommodations to empty the tank contents for inspection of the tank and mixer components. As this is no small task, the process will take several weeks and may stretch into December. If the date of inspection completion should extend beyond the intended termination of the performance bond, this correspondence shall serve as notice that the damage has been observed during the warranty period and that Howard Robson was made aware of the pending liability for repair prior to the expiration of the warranty period.

Letter of John C. Clabauth, 10/29/12, at ¶ 21 (emphasis added). A follow-up June 2013 letter by the Authority's attorney indicates that the Authority's

filed a complaint against Robson alleging that "Robson and its subcontractors performed work on the anaerobic [d]igesters [n]os. 1 and 3 at the [facility] . . . [and that] debris used to make the annular seal had fallen into tank [number 1], damaging one of the mixers." Authority Complaint, 10/7/14, at ¶¶ 28, 33, 36. Robson filed a joinder complaint against JJD,[9] claiming that JJD had improperly handled expanding foam insulation which was the ultimate cause of the damage to the digester tank.[10]

In response to the joinder complaint, JJD requested that Westfield both defend and indemnify it against the Authority's claims. When Westfield

_____

"**inspection demonstrated that damage to the digester occurred as a result of faulty workmanship**." Therefore, the damage is a warranty issue that your client must remedy. As detailed in our previous correspondence, the mixers and heat exchangers must be repaired or rebuilt by the supplier, certified by the supplier, reinstalled, and placed back into service. Additionally, the second primary digester must likewise be inspected to insure that a similar situation does not exist in the tank. If similar conditions are found, the second primary digester must also be rebuilt and placed back into service. Letter of E. Lee Stinnett, II, Esq,, 6/24/13, at ¶ 21 (emphasis added).

[9] Robson also joined other additional defendants in the joinder complaint, averring that they too were "jointly and severally liable with Robson . . . to [the Authority] or liable over to Robson . . . for any such liability." Joinder Complaint, 10/8/14, at ¶¶ 3.

[10] More specifically, the Authority alleged in its complaint that "the debris contacted and damaged at least one roof-mounted mixer, thereafter breaking into several pieces as large as forty pounds each." Authority Complaint, 10/7/14, at ¶ 37. The manufacturer of the mixer conducted an on-site inspection and determined that the mixer suffered bearing damage related to the mixer's impact with the foreign object, the suspected insulation debris. *Id.* at ¶ 41.

declined to provide coverage to JJD, claiming that the allegations were outside the scope of coverage and/or excluded by the policy, JJD instituted the instant declaratory judgment action/breach of contract action against Westfield in February 2016.[11]  On March 15, 2016, Westfield filed preliminary objections to JJD's complaint, which the court denied.  Westfield filed its answer and counterclaim on July 1, 2016.  In its counterclaim Westfield sought declaratory relief, denying that it was required to provide coverage in the underlying suit because:  (1) the allegations do not constitute occurrences triggering coverage under the Policy, and (2) exclusions to the Policy apply to bar coverage to JJD.

In September and October 2016, Westfield and JJD filed cross-motions for summary judgment.[12]  Following oral argument held on January 30, 2017, the trial court denied Westfield's motion.  *See* Order, 4/6/17.  On the following day, the trial court granted in part JJD's motion, ordering that "Westfield [] shall defend JJD [] on the claims set forth in the Joinder Complaint until such

_____

[11] In its declaratory judgment action, JJD alleges that the Authority "alleges that the urethane foam applied to the exterior of the digester tanks *somehow found its way inside* the digester tank and damaged the mixer equipment." Declaratory Judgment Complaint, 3/1/16, at ¶ 21.  The Authority, however, denies this allegation in its answer to the complaint.  Authority Answer to Complaint, 4/1/16, at ¶ 21.

[12] Because the parties filed cross-motions for summary judgment, no material facts are in dispute.  *See* N.T. Summary Judgment Motion Hearing, 1/30/17, at 2.

time that the claim is confined to a recovery that the policy does not cover" and that "Westfield [] is also conditionally obligated to indemnify JJD [] in the event JJD[] is held liable for a claim covered by the policy in the underlying action." Order, 4/7/17. The order further stated that JJD's motion "was [d]enied without prejudice as to the claim for breach of contract." *Id.*

Westfield filed timely notices of appeal[13] and a court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Westfield presents the following issues for our consideration:

(1) Did the trial court err and abuse its discretion in holding that the allegations in the underlying action against Appellee labelled as "negligence" describe factual content that was outside the scope of Appellee's work pursuant to its subcontract and/or the foreseeable consequences of that work, such that these allegations constitute an "occurrence" under the relevant insurance policy?

(2) Did the trial court err and abuse its discretion in holding that *Indalex Inc. v. National Fire Union Ins. Co.*, 83 A.3d 418 (Pa. Super. 2013), applies to this case on the grounds that *Indalex* established a rule that an insurer is obligated to defend its insured whenever the underlying complaint asserts a tort claim based on damages to persons or property other than the insured's product?

(3) Did the trial court err and abuse its discretion in holding that Exclusions "b." and "m." of the applicable insurance policy do not preclude coverage?

(4) Did the trial court err and abuse its discretion in holding that [Westfield] has a duty to indemnify [JJD] in the event [JJD] is held liable in the underlying action?

---

[13] The parties entered into a joint stipulation to consolidate these appeals. *See* Pa.R.A.P. 513; Joint Stipulation to Consolidate Appeals, 6/9/17.

Appellant's Brief, at 5-6.

Our scope and standard of review of an order granting summary judgment[14] of an insured's coverage is well-settled:

> An appellate court may reverse the grant of a motion for summary judgment if there has been an error of law or an abuse of discretion. Since the issue as to whether there are no genuine issues as to any material fact presents a question of law, our standard of review is *de novo*; thus, we need not defer to the determinations made by the lower tribunals. Our scope of review, to the extent necessary to resolve the legal question before us, is

---

[14] We note that:

> Once a motion for summary judgment is made and is properly supported, however, the non-moving party may not simply rest upon the mere allegations or denials in his or her pleadings. Pa. R. Civ. P. 1035(d). In such a case, Rule 1035(d) requires that by affidavits or as otherwise provided in this rule, the non-movant must set forth specific facts showing that there is a genuine issue for trial. The purpose of Rule 1035(d) is "'to assure that the motion for summary judgment may "pierce the pleading and to require the opposing party to disclose the facts of his claim or defense."'" Thus, once the motion for summary judgment has been properly supported, the burden is upon the non-movant to disclose evidence that is the basis for his or her argument resisting summary judgment.

**Samarin v. GAF Corp.**, 571 A.2d 398, 402 (Pa. Super. 1989) (emphasis in original) (citations omitted). Moreover, a motion for summary judgment may properly be granted only:

> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Pa.R.C.P. 1035(b).

plenary. We must view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party.

***Chanceford Aviation Properties, LLP. V. Chanceford Towp. Bd. of Supervisors***, 923 A.2d 1099, 1103 (Pa. 2007) (internal citations omitted).

> When interpreting an insurance policy, we first look to the terms of the policy. "When the language of the policy is clear and unambiguous, we must give effect to that language." ***Donegal Mut. Ins. Co. v. Baumhammers***, []938 A.2d 286, 290 (Pa. 2007). "However, 'when a provision in the policy is ambiguous, the policy is to be construed in favor of the insured[.]'" . . . Also, we do not treat the words in the policy as mere surplusage and, if at all possible, we construe the policy in a manner that gives effect to all of the policy's language. ***Teno v. State Farm Ins. Co.***, 716 A.2d 626, 631 (Pa. Super. 1998)[.]
>
> We then compare the terms of the policy to the allegations in the underlying complaint. "It is well established that an insurer's duties under an insurance policy are triggered by **the language of the complaint against the insured**." In determining whether an insurer's duties are triggered, the factual allegations in the underlying complaint are taken as true and liberally construed in favor of the insured. "It does not matter if in reality the facts are completely groundless, false or fraudulent. It is the face of the complaint and not the truth of the facts alleged therein[.]" ***D'Auria v. Zurich Ins. Co.***, [] 507 A.2d 857, 859 (Pa. Super. 1986).

***Indalex Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA***, 83 A.3d 418, 420-21 (Pa. Super. 2013) (headnotes, citations and quotations omitted) (emphasis added).

"The obligation of the insured to defend an action is "fixed solely by the allegations in the underlying complaint." ***Erie Ins. Exchange v. Lobenthal***, 114 A.3d 832, 836 (Pa. Super. 2015). Finally, the insurer "is required to accept all of the allegations contained in the third party's complaint as true

and provide a defense if there is a chance that the injury alleged could potentially fall within the scope of the policy." *Selective Way Ins. Co. v. Hosp. Grp. Services, Inc.*, 119 A.3d 1035, 1046 (Pa. Super. 2015). "[T]he duty to defend is not limited to meritorious actions; it even extends to actions that are groundless, false, or fraudulent as long as there exists the possibility that the allegations implicate coverage." *Am. & Foreign Ins. Co.*, 2 A.3d 526, 541 (Pa. 2010) (citations and quotation marks omitted). "The duty to defend persists until an insurer can limit the claims such that coverage is impossible." *Lexington Ins. Co. v. Charter Oak Fire Ins. Co.*, 81 A.3d 903, 911 (Pa. Super. 2013) (emphasis omitted).

Westfield claims that JJD did not prove that it was entitled to coverage under the parties' policy because the underlying claim stems from JJD's faulty or defective performance of its contractual work with Robson. Accordingly, Westfield contends that the damage does not constitute an "occurrence" under the policy, especially where the claim has been recast as one in tort.

The parties' CGL policy provides, in relevant part:

SECTION I – COVERAGES

> COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY
>
> 1. Insuring Agreement
>
> a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking

damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result.

b. This insurance applies to "bodily injury" and "property damage" only if:

(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory;"

SECTION V - DEFINITIONS

8. "Impaired property" means tangible property, other than "your product" or "your work," that cannot be used or is less useful because:

a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous;

b. You have failed to fulfill the terms of a contract or agreement; if such property can be restored to use by the repair, replacement, adjustment or removal of "your product'" or "your work;" or your fulfilling the terms of the contract or agreement.

17. "Property damage" means:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

22. "Your work"

a. Means:

(1) Work or operations performed by you or on your behalf and

(2) Materials, parts or equipment furnished in connection with such work or operations.

b. "Your work" includes:

(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work;" and

(2) The providing of or failure to provide warnings or instructions.

Finally, the policy defines occurrence as "an accident including continuous or repeated exposure to substantially the same general harmful conditions."

The policy also contains the relevant exclusions:

b. Contractual Liability

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement.

\* \* \*

m. Damage to Impaired Property or Property Not Physically Injured

(1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work;" or

(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its term.

Westfield Commercial General Liability Policy No. CWP5177101, 3/20/12.

General liability insurance policies are intended to provide coverage where the insured's product or work causes personal injury or damage to the person or property of another. *Ryan Homes Inc. v. Home Indem. Co.*, 647 A.2d 939 (Pa. Super. 1994). "Provisions of a general liability policy provide coverage . . . if the insured work or product actively malfunctions, causing injury to an individual or damage to another's property." *Id.* at 942. These

types of insurance policies involve risks that are limited in nature; they are not the equivalent of a performance bond on the part of the insurer. ***Snyder Heating Co. v Pennsylvania Mfrs.' Ass'n Ins. Co.***, 715 A.2d 48

In ***Kvaerner Metals Div. of Snaerner U.S., Inc. v. Commercial Union Ins. Co.***, 908 A.2d at 888 (Pa. 2006), our Supreme Court stated:

> The risk intended to be insured [by commercial general liability policies] is the possibility that the goods, products or work of the insured, once relinquished and completed, will cause bodily injury or damage to property other than to the completed work itself and for which the insured by [sic] be found liable. The insured, as a source of goods or services, may be liable as a matter of contract law to make good on products or work which is defective or otherwise unsuitable because it is lacking in some capacity. This may even extend to an obligation to completely replace or rebuild the deficient work or product. This liability, however, is not what the coverages in question are designed to protect against. **The coverage is for tort liability for physical damages to others and not for contractual liability of the insured for economic loss because the product or completed work is not that for which the damaged person bargained.**

***Id.*** at 899 n.10 (citation omitted) (emphasis added). ***Kravener*** held that a third party's complaint, alleging only faulty workmanship and damage to the insured's work product, does not trigger coverage under a standard CGL policy where the underlying complaint contained claims for breach of contract and breach of warranty.

It is well-settled that it is the *nature of the allegations* themselves, not the particular cause of action that is pled in the complaint that determines whether coverage has been triggered. ***Mutual Benefit Ins. Co. v. Haver***, 725 A.2d 743, (Pa. 1999). Thus, while the Authority's complaint included

breach of contract, negligence, and declaratory judgment counts against Robson, the complaint alleges that a "workmanship defect on Robson's part" caused the ultimate damage to the digester tank. Authority Complaint, 10/7/14, at ¶¶ 46-47, 78-103. Specifically, the complaint alleges that an inspection as well as photographic evidence show the defect was in contravention of the construction drawings that indicated "a need to confine the sealant material to the annular space." *Id.* at ¶ 46.

With regard to the allegations in the joinder complaint filed by Robson against JJD and the other additional defendants, Robson claims that under the Robson-JJD subcontract, JJD "was obligated to perform its work in a good and workmanlike manner and in full compliance with the plans and specifications under the [Robson-Authority] contract." Joinder Complaint, 10/8/14, at ¶ 13. Moreover, the joinder complaint alleges that if the foam insulation JJD installed was installed "contrary to the applicable plans and specifications or in an otherwise defective, deficient or unworkmanlike manner, then JJD is solely liable to [the Authority] on such claim, and/or liable to Robson on such claim for breach of contract and/or jointly and severally liable with Robson on such claim." *Id.* at ¶ 15. Finally, the joinder complaint premises Robson's other counts against JJD on "carelessly or negligently handl[ing] and installing" the foam. *Id.* at ¶¶ 18, 21.

Here, the trial court concluded that Westfield did not have a duty to defend either the breach of contract or the breach of warranty claims in the joinder complaint since the claims were premised upon faulty workmanship,

- 14 -

which does not constitute an "occurrence" under the parties' policy. ***Kvaerner***, ***supra***. However, the court found that the language in the Authority's complaint and the joinder complaint regarding property damage that "occurred as a result of conduct outside of the scope of the [Authority's contract with Robson] and JJD's Subcontract[,]" could be considered an "occurrence" under the policy, which could potentially fall within the policy's coverage. Simply put, the trial court found that Westfield has a duty to defend, and potentially indemnify, Robson where it "carelessly allowed foam insulation to enter the digester [t]ank." Trial Court Opinion, at 16.

The trial court's opinion relies heavily upon ***Indalex Inc. v. National Union Fire Ins. Co.***, 83 A.3d 418 (Pa. Super. 2013), to conclude that Westfield had a duty to defend and a potential duty to indemnify JJD under the parties' insurance policy. In ***Indalex***, the trial court granted summary judgment in favor of Appellee-Insurer, National Union, in a coverage dispute involving multiple out-of-state lawsuits filed by homeowners and property owners against Appellants-Insureds when water leakage caused physical damage to their homes (e.g., mold and cracked walls), as well as personal injury. The lawsuits claimed that the damage was a result of the defective design or manufacturing of appellants' windows and doors. Appellants alleged that they were entitled to coverage from National Union pursuant to a commercial umbrella policy. National Union claimed that it was not required to provide coverage because there was no "occurrence" under the parties' policy that triggered coverage.

- 15 -

Characterizing the claims in the case as "product-liability based tort claims," our Court in *Indalex* reversed the trial court's order entering summary judgment in favor of National Union. Specifically, our Court found that the issues framed in the case involved a bad product that could be construed as an active malfunction and not merely bad workmanship. *Id.* at 424. Moreover, because the National Union policy contained language defining "occurrence" as property damage "neither expected nor intended *from the standpoint of the Insured*," the court concluded that damages such as mold, from an insured's subjective viewpoint, were "arguably not expected." *Id.* at 425 (emphasis added). In finding that National Union had a duty to defend Appellants, our Court stated "[b]ecause the underlying complaints alleged defective products resulting in property loss, to property other than Appellants' products, and personal injury, we conclude there was an "occurrence." *Id* at 426.

Instantly, we are not dealing with a bad product as in *Indalex*; it has never been alleged that the damage to the digester tank resulted from defective design or bad product manufacturing or was the result of the foam malfunctioning. Moreover, the parties' policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions," very different language than the subjective language of occurrence used in the parties' policy in *Indalex*.

In *Millers Capital Ins. Co. v. Gambone Bros. Dev. Co.*, 941 A.2d 706 (Pa Super. 2007), two groups of homeowners individually brought lawsuits

against the builder, Gambone, for "faulty workmanship" that resulted in property damage to their homes. Specifically, the homeowners' "complaints aver[red that] Gambone and/or its subcontractors built homes with defective stucco exteriors, windows, and other artificial seals intended to protect the home interiors from the elements. Both complaints were based on claims of faulty workmanship. Both complaints alleged that when the defects manifested themselves, water damage resulted to the interior of the larger product – in this case, the home interiors." *Id.* at 713. The trial court ultimately held that Gambone's insurance company, Miller's, had no duty to defend or indemnify the builder against the homeowners' actions, finding that **Kvaerner** controlled the decision. On appeal, our Court affirmed the trial court, concluding that the damage to the homes, a result of faulty work, was not an occurrence because it was not a fortuitous event triggering coverage. The court stressed that in order to give effect to the policy's language, keeping in mind the doctrine of in *pari material*, "occurrence" could be defined in no other way.

The trial court concludes that the instant action involves, in addition to faulty workmanship, tort claims against Robson and JJD for property damage that may have occurred outside of the scope of the Authority's contract with Robson and the Robson-JJD subcontract. In fact, **Gambone** discussed this exact scenario as follows:

> Conversely, the trial court's disposition of these cases allows for the term "occurrence" to be read in *pari material* with the exception to the "your work" exclusion in situations where a

plaintiff sues a contractor for faulty work performed by a subcontractor. For example, a scenario could arise where a subcontractor confuses job orders and works on a part of a project on which it was not contracted to work; such a scenario would, in all likelihood, be considered an "occurrence" which would not be defined as faulty workmanship and would fit within the exception to the "your work" exclusion. We can also conjure up additional examples. A subcontractor could use materials on a job not contemplated by the contractual arrangement between the contractor and subcontractor. An error such as this could also be considered an "occurrence" and could fit within the exception to the "your work" exclusion.

*Id.* at 715-16. While neither of these specific hypothetical scenarios are present in the instant case, the complaint against the insured, JJD (or, the joinder complaint), alleges negligent handling of the foam insulation and careless/negligent installation of the foam not in accordance with the plans and specifications of the project. Therefore, while the Authority's complaint was grounded in allegations of defective workmanship, Robson's joinder complaint does allege claims of negligent and careless work and work outside of the scope of the parties' contract. Under such circumstances where the "complaint 'might or might not' fall within the policy's coverage as an "occurrence", the insured is obligated to defend."[15] *Am. & Foreign Ins. Co.*, *supra* at 541.

Orders affirmed.

_____

[15] Again, we recognize that Westfield's duty to defend lasts only "until such time as the claim[s are] confined to a recovery that the policy does not cover." *Erie Ins. Exch. v. Transamerica Ins. Co.*, 533 A.2d 1363, 1368 (Pa 1987) (citation omitted).

- 18 -

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:2/9/18